UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| FIELD INTELLIGENCE, INC., | : | |
| | : | |
| Plaintiff, | : | Hon. Joseph H. Rodriguez |
| | : | |
| v. | : | |
| | : | Civil Action No. 19-20590 |
| XYLEM DEWATERING SOLUTIONS, INC., | : | |
| | : | **Opinion** |
| Defendant. | : | |

This matter comes before the Court by way of Defendant Xylem Dewatering Solutions, Inc.'s ("Defendant") Motion to Stay Pending Arbitration [Dkt. 86] and Plaintiff Field Intelligence, Inc.'s ("Plaintiff") Opposition and Cross-Motion for Declaration of Non-Arbitrability [Dkt. 88].  For the reasons discussed below, the Court will deny Defendant's motion, deny Plaintiff's cross-motion, and enjoin arbitration on the issues disputed here.

I. **Factual and Procedural Background**

Because this matter involves facts similar to those that the Court considered previously when deciding Defendant's Motion to Dismiss [Dkt. 46], the Court largely repeats the factual background recited there.

Plaintiff is "a leading provider of Internet of Things (IoT) smart-enabled services that provide satellite and terrestrial wireless communications to agriculture, oil and gas, heavy equipment, and industrial assets, enabling customers to easily gather, compile, analyze, and transform edge-data from a broad range of remote equipment assets."  [Dkt. 1 ("Compl.") ¶ 2]. Plaintiff developed the following proprietary products relevant to the present dispute:

> hardware units, including dual cellular and satellite remote
> terminal units (RTUs), that connect to devices deployed in the
> field, collect data from the devices and relay the data back to a

1

>company's computer systems ('Field Units'),[1] (2) computer software that is used to monitor the operation and status of remotely located machinery and provides clients with a user interface to view the real-time and historical operation of their machinery ('Software'), and (3) support services and hosted websites to monitor the status and operation of remotely located machinery via the Field Units and Software.

[Compl. ¶ 11].

Defendant is a "water technology provider" that deals in portable electric or diesel driven water pumps, which may be used in a variety of circumstances." [Dkt. 24-5 at ¶ 2, 3]. Its "diesel motor driven pumps included a programmable microprocessor control system (marketed under the PrimeGuard® brand) capable of managing the operation of the diesel motor based on a variety of external inputs, including flow meters, level transducers, pressure transducers, and float switches." [Dkt. 24-5 at ¶ 3]. According to Defendant, the control system allows pumps to operate without constant operator intervention [*Id.*], for which Defendant offers limited remote wireless connectivity. [*Id.* at ¶ 4].

In May 2012, Defendant contacted Plaintiff to research, develop, and provide Field Units for Defendant's wireless communications with its pumps. [*Id.* at ¶ 5]. On or around June 19, 2012, Defendant began to issue purchase orders for certain "research services," "telemetry units," and other goods and services from Plaintiff. [*Id.* at ¶ 6; Dkt. 90-3]. The parties entered into a non-disclosure agreement on August 2, 2013 ("the 2013 Contract") to "discuss the development of a custom telematics solution." [Dkt. 12-2]. The 2013 Contract provides: "Confidential Information disclosed hereunder shall at all times remain, as between the Parties, the property of the Disclosing Party. No license under any trade secrets, copyrights, or other

---

[1] The parties' various agreements, discussed below, refer to these goods interchangeably as "Field Units" and "Hardware Units."

rights is granted by this Agreement or any disclosure of Confidential Information hereunder." [*Id.* at ¶ 3]. The 2013 Contract defines "Confidential Information" broadly to include "any and all of either Party's confidential, secret, or proprietary data or information … including but not limited to, products and services, intellectual property … and any other data or information relating to either Party…." [*Id.* at ¶ 1]. The 2013 Contract also contains the following arbitration clause:

> Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination, or invalidity thereof, shall be finally settled by arbitration in accordance with the Rules of the American Arbitration Association (AAA).  The arbitration tribunal shall be composed of a sole arbitrator in accordance with the aforementioned Rules.  The place of arbitration shall be selected by the party against whom such action is filed…. This Agreement shall be governed by and construed in accordance with the laws of the state where the request for arbitration or injunction is filed, without regard to its principles of conflict o flaw.

[Dkt. 12-2 at 4]. After entering the 2013 Contract, Plaintiff continued to supply Defendant with its technology, and sold pumps that included Plaintiff's technology to its customers. [Dkt. 24-5 at ¶¶ 7, 9].

The parties' relationship expanded, and in April 2017 the parties entered into a Software Subscription Agreement (the "2017 Contract"). [Dkt. 12-3]. Defendant entered the 2017 Contract to "access and use [Plaintiff's software] via a website hosted by [Plaintiff] to monitor the status and operation of remotely located machinery via the Hardware Unit." [Dkt. 12-2 at ¶ C]. The 2017 Contract gave Defendant

> a limited non-exclusive, non-transferable right to access and use and permit Authorized Users to access and use the Services solely for internal business use. The services shall not be used by client or by Authorized users for, or on behalf of, third parties that are not authorized under this Agreement … Client  shall  be  responsible

3

>and liable to Provider for any breach of this Agreement by any Authorized user, subject to terms of this Agreement. Client Acknowledges that its right to use the services will be web-based only pursuant to the terms of this Agreement and the software will not be installed on any servers or other computer equipment owned or controlled by Client or otherwise provided to Client.

[Dkt. 12-3 at ¶ 1]. The 2017 Contract further states that "[Defendant] acknowledges that all right, title, and interest in and to the Services and the Software, together with its codes, sequences, derivative works, organization, structure, interfaces, any documentation, data, trade names, trademarks, or other related materials … is, and at all times shall remain, the sole and exclusive property of [Plaintiff]." [Dkt. 12-3 ¶ 2.a]. The 2017 Contract also contains the following choice of law and forum selection clause:

>**Governing Law**; Forum Selection. This Agreement shall be governed exclusively by the laws of the State of New Jersey, without regard to its conflicts of laws principles. Any action under or concerning this Agreement shall be brought exclusively in a state or Federal court in New Jersey. The parties irrevocably agree and consent that said forum is convenient and has jurisdiction to hear and decide any such action.

[Dkt. 12-3 at ¶ 11.b].

In 2019, Plaintiff discovered that Defendant built its own RTUs and believed that Defendant's RTU "was a near identical copy" of Plaintiff's technology. [Compl. at ¶ 23]. Plaintiff filed a complaint with this Court asserting the following claims: Breach of Contract (Count I); Breach of the Implied Covenant of Good faith and Fair Dealing (Count II); Misappropriation of Trade Secrets under New Jersey law (Count III); Misappropriation of Trade Secrets under Federal law (Count IV); and Unfair Competition (Count V). The Complaint grounds these theories of liability entirely in the 2017 Contract and does not mention the 2013 Contract. [Compl. at ¶ 3–4].

On April 30, 2020, this Court issued an opinion addressing Plaintiff's Motion for Preliminary Injunction and for Expedited Discovery [Dkt. 11] and Defendant's Motion to Dismiss or for More Definite Statement [Dkt. 16]. [Dkt. 46]. The Court's opinion made certain findings regarding the 2013 Contract, which will be discussed in detail below.

The parties then commenced discovery. Defendant served interrogatories on Plaintiff, one of which stated

> If [Plaintiff] intends to rely on the Parties' [2013 Contract] to support any part of its affirmative claims, provide the full basis for such reliance, including, but not limited to, identification of all terms in the Parties' [2013 Contract] that [Plaintiff] intends to rely on and identification of any actions or statements by the parties that [Plaintiff] intends to rely on to show compliance or non-compliance with a particular term in the Parties' [2013 Contract].

[Dkt. 86-3]. On December 16, 2020, Plaintiff responded that

> sections of the [2013 Contract] obligated Xylem to keep confidential, not copy, not modify, and not create derivative works from the design…. Xylem breached the provisions [of the NDA] by copying the design and functionality of the Field Units, modifying Field Units, using Field Units to test and develop Xylem's knock off designs, sending Field Units to APD&M for purposes of developing Xylem's knock off designs, and not taking reasonable precautions to protect the confidentiality of the Field Units.

[*Id.*].

After receiving this interrogatory response, Defendant filed a demand for arbitration with the American Arbitration Association ("AAA"). [Dkt. 86-4]. The demand seeks "inter alia, final and binding determinations that Xylem has not breached the 2013 NDA; that the 2013 NDA imposed no obligations on Xylem to maintain the confidentiality of RTUs; and that Xylem did not misappropriate any of FI's alleged trade secrets." [Dkt. 86 at 9; Dkt. 86-4]. Defendant then

filed the present Motion to Stay Pending Arbitration. [Dkt. 86]. Plaintiff filed a response brief and a cross-motion seeking a Court declaration that Defendant may not arbitrate claims under the 2013 Contract or, alternatively, an order to continue litigation without stay while the parties arbitrate issues related to the 2013 Contract. [Dkt. 88]. After the parties submitted their motions, Judge Williams ordered that the AAA proceedings be stayed pending this Court's ruling on the motions. [Dkt. 93].

## II.   Analysis

To determine whether to stay this case pending arbitration of the 2013 Contract issues, the Court must first determine whether the 2013 Contract requires Plaintiff to participate in arbitration. Thus, the Court will first consider Plaintiff's argument that Defendant should not be permitted to arbitrate claims related to the 2013 Contract.

### a.   2013 Contract's Arbitration Clause and Threshold Issue of Contract Formation

The Court must first decide whether the arbitration clause contained in the 2013 Contract permits the Court to decide any threshold issues of arbitrability or requires the arbitrator to decide these issues. "[T]he general rule is that questions of arbitrability are for the court to resolve." *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 187 (3d Cir. 2010). "Parties can agree to delegate this decision to an arbitrator instead, but because of the presumption, the delegation must be 'clear and unmistakable.'" *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 322 (W.D. Pa. 2020) (citing *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014)).

Plaintiff argues that the Court must determine the threshold issue of whether Plaintiff agreed to be bound by the 2013 Contract and its arbitration clause after entering the 2017 Contract. [Dkt. 88 at 7]. Defendant argues that an arbitrator must decide this contract formation

issue because the 2013 Contract's arbitration clause clearly and unmistakably incorporates AAA's rules by reference, and AAA Rule 7(a) states that an arbitrator can decide "any objections with respect to the existence, scope, or validity of the arbitration agreement." [Dkt. 90 at 7]. Even if the 2013 Contract "clearly and unmistakably" delegated threshold issues of contract formation to an arbitrator,[2] the Court must review the threshold contract formation issue.

In *MZM Construction Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds* the Third Circuit addressed the same "mind-bending" issue which the parties present here: "[w]ho decides—a court or an arbitrator—whether an agreement exists, when the putative agreement includes an arbitration provision empowering an arbitrator to decide whether an agreement exists." 974 F.3d 386, 392 (3d Cir. 2020). In that case, the defendants sought arbitration under a

---

[2] In general, arbitrators may determine threshold issues of arbitrability where there is "clear and unmistakable evidence" that the parties intended to submit such issues to an arbitrator. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019). The Court doubts that the 2013 Contract's general reference to AAA's rules provides such "clear and unmistakable evidence" of the parties' intent. *See HealthplanCRM, LLC*, 458 F. Supp. 3d at 323 (rejecting the notion that a mention of AAA is "clear and unmistakable" evidence, and finding that Third Circuit precedent requires a "[c]ourt to do more than scour the relevant contract for the magic letters 'AAA.'" (citing *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 758 (3d Cir. 2016))). Defendants have cited to the 2016 version of AAA's Commercial Arbitration Rules and Mediation Procedures ("the Commercial Rules") as evidence in this case. [Dkt. 90 at 8 n.3]. The 2013 Contract, however, does not specify that the Commercial Rules apply, rather than any other body of rules that comprise AAA's rules library. *See* American Arbitration Association, *Rules, Forms, Fees*, https://adr.org/active-rules (visited March 5, 2021). Nor does it specify which year's edition of AAA's Commercial Rules applies. Further, AAA Rule 7 "is, by itself, permissive. It provides that the arbitrator has the 'power' to decide his or her jurisdiction, but it doesn't say (as some other arbitration rules do) that the arbitrator 'shall' do so or that the arbitrator's power is 'exclusive.'" *HealthplanCRM, LLC*, 458 F. Supp. 3d at 325. Courts have found the permissive nature of this rule to be problematic, especially where—as here—the contract's delegation clause does not state that disputes must be resolved "exclusively" through arbitration governed by AAA's rules. *See id.* (collecting cases). Though the Court need not decide this issue, the 2013 Contract's arbitration clause likely implicates a "daisy chain" of inferences and assumptions that precludes the Court from finding a "clear and unmistakable" intent to delegate threshold issues to an arbitrator. *Chesapeake Appalachia, LLC*, 809 F.3d at 762–63.

contract which contained an arbitration clause and a delegation clause stating that "[t]he Arbitrator shall have the authority to decide whether an Agreement exists, where that is in dispute." *Id.* at 393. The plaintiff argued that fraud in the inducement voided the contract which contained the arbitration clause and therefore voided the arbitration clause. *Id.* at 392. The defendants argued that the delegation clause's plain language required an arbitrator—not the court—to decide the threshold issue of whether fraudulent inducement voided the contract. *Id.* at 399–400.

The Third Circuit held that gateway questions concerning the existence or formation of a contract "are for the courts to decide," even if a contract contains a delegation clause that delegates those questions to an arbitrator. *Id.* at 402. With respect to arbitration agreements generally, the court confirmed that 9 U.S.C. § 4 "'affirmatively requires' a court to decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent." *Id.* at 397–98 (citing *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 108–09 (3d Cir. 2000)).³ The court found that this same principle applies to delegation clauses which are, in effect, arbitration clauses within arbitration clauses. *Id.* at 400 ("Lack of assent to the container contract necessarily implicates the status of the arbitration agreement, when the container contract and the arbitration provision depend on the same act for their legal effect.").⁴ The court

---

³ This proposition is well-established in the Third Circuit and elsewhere. *See AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting *United Steelworkers of Am.*, 363 U.S. at 582); *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 288 (3d Cir. 2003) ("[A] contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it.").

⁴ The court also found that parties challenging the existence or formation of a contract need not specifically attack the arbitration or delegation clauses contained therein in order to have a

concluded that the court—not an arbitrator—had to determine whether fraudulent execution precluded the arbitration clause's enforcement, despite the delegation clause. *Id.* at 402.

Following *MZM Construction*, the Court must determine whether a contract containing an arbitration clause exists. To reiterate, Defendant argues that the 2013 Contract requires arbitration [Dkt. 90 at 7–9], but Plaintiff argues that the 2017 Contract superseded the 2013 Contract and, therefore, that Plaintiff no longer assented to the 2013 Contract or its arbitration clause. [Dkt. 88 at 17]. This dispute concerns the formation or existence of a contract. *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019) (noting that the Third Circuit has "ma[de] clear … that the question of whether a later agreement supersedes a prior arbitration agreement is tantamount to whether there is an agreement to arbitrate."). Because *MZM Construction* requires courts to consider threshold questions of contract existence or formation, the Court must do so here, even if the parties "clearly and unmistakably" delegated this responsibility to arbitrators in the 2013 Contract.

### i. Applicable Law

The Court must now consider whether the 2017 Contract supersedes the 2013 Contract's arbitration clause with respect to the intellectual property rights of Plaintiff's Field Units as a matter of contract law. *Pearson v. Valeant Pharm. Int'l, Inc.*, No. CV 17-1995-BRM-DEA, 2017 WL 6508358, at *3 (D.N.J. Dec. 20, 2017) ("Under the FAA, agreements to arbitrate are 'valid, irrevocable, and enforceable,' subject only to traditional contract principles. (Citing 9 U.S.C. § 2)). "[C]ourts should generally look to the relevant state contract law to determine whether a

---

court—rather than an arbitrator—decide the threshold question of contract formation. *MZM Construction Co.*, 974 F.3d at 400.

valid agreement to arbitrate exists." *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288 (3d Cir. 2017).

Though the parties do not dispute the applicable state contract law, the Court confirms that New Jersey law governs the Court's interpretation of this contract issue. Where, as here, "a district court's jurisdiction is predicated on diversity of the parties, or when the court hears a state-law claim based on its supplemental jurisdiction … the court must determine whether … a matter is substantive or procedural." *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008) (citations omitted). "[I]f the matter is substantive, the court must apply the substantive law of the forum state." *Id.* (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1223 (3d Cir. 1995)). Contract interpretation questions are substantive issues, and state law applies. *Zydus Worldwide DMCC v. Teva API Inc.*, 461 F. Supp. 3d 119, 130 (D.N.J. 2020) (citing *In re McGraw-Hill Global Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018)).

Because the parties have cited New Jersey law throughout their briefing and have not disputed the applicability of New Jersey, the Court will apply New Jersey law without engaging in a choice of law analysis. *See Chin*, 538 F.3d at 278 ("If the court determines that it must apply the law of the forum state, and a choice-of-law question exists, the court must, at the second step, apply the choice-of-law rules of the forum state to determine which state's law applies." (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941))).

### ii. Contract Existence or Formation

Under New Jersey law, "'[a]n arbitration agreement is a contract and is subject, in general, to the legal rules governing the construction of contracts.'" *Pearson*, 2017 WL 6508358, at *4 (quoting *McKeeby v. Arthur*, 81 A.2d 1, 4 (N.J. 1951). "[T]he duty to arbitrate ...

10

[is] dependent solely on the parties' agreement." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cantone Rsch., Inc.*, 427 N.J. Super. 45, 58, 47 A.3d 1, 8 (App. Div. 2012) (citing *Cohen v. Allstate Ins. Co.*, 231 N.J. Super. 97, 101, 555 A.2d 21 (App. Div.), *certif. denied*, 117 N.J. 87, 563 A.2d 846 (1989)) (alterations in original). "The determination as to whether such a duty exists 'rests solely on the parties' intentions as set forth in the writing.'" *Id.* (quoting *Martindale v. Sandvik, Inc.*, 173 N.J. 76, 92, 800 A.2d 872, 881 (2002)).

Like other contract provisions, "an arbitration clause may be modified or superseded." *Wein v. Morris*, 944 A.2d 642, 648 (N.J. 2008). A subsequent agreement generally "rescinds, supersedes, and substitutes for the earlier contract" where "the subsequent contract cover[s] the same subject matter and [is] made by the same parties, but contain[s] terms inconsistent with the former contract so that the two cannot stand together." *Kant v. Seton Hall University*, No. 03–6135, 2008 WL 65159, *7 (D.N.J. Jan. 4, 2008) (quoting *Rosenberg v. D. Kaltman & Co.*, 101 A.2d 94, 96 (N.J. Super. Ct. Ch. Div. 1954)). "[A]s a general matter, integration clauses are meant to act as 'conclusive evidence that the parties intended to supersede any prior contract on the same subject matter.'" *Skold v. Galderma Lab'ys L.P.*, 917 F.3d 186, 194 (3d Cir. 2019) (quoting *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002)). Thus, with respect to arbitration clauses, "courts will enforce pre-existing arbitration agreements when a subsequent agreement **neither** addresses the issue of arbitration **nor** includes a complete merger or integration clause." *Pearson*, 2017 WL 6508358, at *5 (emphasis added).

In this case, the 2017 Contract contains both a provision that "addresses the issue of arbitration" and an integration clause. The parties do not dispute that the "same parties" entered the 2013 and 2017 Contracts. The parties also do not dispute that the 2017 Contract contains a forum selection clause which requires the parties to litigate all disputes "under or concerning"

11

the contract in New Jersey courts. [Dkt. 12-3 at ¶ 11.b].[5] This forum selection clause squarely addresses and is "inconsistent with" the 2013 Contract's arbitration clause. *See Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 525 (2d Cir. 2011) (reviewing analogous forum selection and arbitration clauses in consecutive contracts and holding that the second contract's forum selection clause "specifically precludes arbitration… and, by operation of the merger clause, displaces the [first contract's] arbitration clause.").

The parties disagree as to whether the 2017 and 2013 Contracts concern the same "subject matter." Defendant argues that the sole purpose of the 2013 Contract was to "discuss[] the development of a custom telematics solution," and "did not include any terms relating to software subscription or services." [Dkt. 90 at 11]. Defendant claims that the 2017 Contract did not concern information exchanged as part of product development, but only concerned "Software Subscription Services." [Dkt. 88 at 11–12]. Plaintiff argues that the 2013 and 2017 Contracts both concerned the Field Units which Plaintiff provided to Defendant, that the 2013 Contract "falls within the 'subject matter' of the 2017 [Contract] and is, therefore, replaced by it." [Dkt. 88 at 15].

Although the 2017 and 2013 Contracts differ in many ways, a common thread runs through them: contractual protection for Plaintiff's intellectual property rights to its Field Units. The 2013 Contract defined "Confidential Information" broadly to include "**any and all** of either Party's confidential, secret, or proprietary data or information … including but not limited to,

---

[5] To reiterate, and for ease of reference, the 2017 Contract's forum selection clause states

> **Governing Law**; Forum Selection. This Agreement shall be governed exclusively by the laws of the State of New Jersey, without regard to its conflicts of laws principles. Any action under or concerning this Agreement shall be brought exclusively in a state or Federal court in New Jersey. The parties irrevocably agree and consent that said forum is convenient and has jurisdiction to hear and decide any such action.

**products and services**, intellectual property … and **any other data or information relating to either Party**….」 [Dkt. 12-2 at ¶ 1] (emphasis added).  The 2013 Contract further states that "Confidential Information disclosed hereunder … shall at all times remain … the property of [Plaintiff]," [Dkt. 12-2 at ¶ 3], and that Defendant "**shall not duplicate in any manner** … the Confidential Information or any part thereof." [Dkt. 12-2 at ¶ 4] (emphasis added).  Similarly, the parties entered the 2017 Contract to grant Defendant "a limited non-exclusive, non-transferable right to access and use and permit Authorized Users to access and use the Services solely for internal business use." [Dkt. 12-3 at ¶ 1].  The 2017 Contract further states that "[Defendant] acknowledges that all right, title, and interest in and to the Services and the Software, together with its codes, sequences, derivative works, organization, structure, interfaces, any documentation, data, trade names, trademarks, or **other related materials** … is, and at all times shall remain, the sole and exclusive property of [Plaintiff]. [Dkt. 12-3 ¶ 2.a] (emphasis added).  It also states:

> In addition to, and in no way limiting the requirements relating to the Provider IP as set forth in Section 2 of this Agreement, both parties shall use its reasonable efforts (but in no case less than the efforts used to protects its own proprietary information of a similar nature) to protect **all** proprietary, confidential, and/or non-public information (written, oral, electronic or otherwise) **relating to** each Party's business, **products**, customers, business associates, IT operations, processes, intellectual property and/or trade secrets or **in any way connected to the Software**, the Services, the use thereof by [Defendant], and this Agreement (the "Confidential Information").

[Dkt. 12-3 ¶ 8.a].  Appendices A and B of the 2017 Contract explicitly refer to Field Units and create a fee schedule based on the delivery and use of Field Units.

13

[*Id.* at App'x A, B] ("Client currently has 541 Hardware Units deployed in the field…").[6]

The Court has already interpreted these 2017 and 2013 Contract provisions to include the Field Units at issue here.  In denying Plaintiff's Motion for a Preliminary Injunction, the Court found that that the software and services contemplated in the 2017 Contract were so intertwined with the  Hardware Units that "[t]o construe the [2017 Contract] to exclude Hardware Units from Services would render the performance of the contract impossible."  [Dkt. 46 at 9] (citations and quotations omitted).  The Court added, "[i]t is also evident from the relationship of the Plaintiff and Defendant, and relevant circumstances at the time they entered into the [2017 Contract], that it was not the intent to exclude Hardware Units from protected Services." [*Id.* at 11].  Among the "circumstances" that the Court considered was the 2013 Contract, which rendered the Hardware Units "deployed prior to the [2017 Contract] not only confidential, but protected." [*Id.* at 11, 12 n.2].  With respect to the 2013 Contract, the Court found that "Defendant admits that it engaged Plaintiff with the specific intent of obtaining RTU's, and later entered into the [2013 Contract] with the intent 'to discuss the development of custom telematics solution.'" [*Id.* at 11]. Thus, this Court has already interpreted both the 2013 and 2017 Contracts to include Field Units among their "subject matter."

Despite Defendant's arguments to the contrary, the 2017 Contract's merger clause provides further evidence of the parties' intent to litigate issues concerning Plaintiff's intellectual property rights to the Field Units in New Jersey courts.[7]  [Dkt. 12-3 at ¶ 11.i].  *See Skold*, 917

---

[6] The 2017 Contract also specifies that Plaintiff "provides and sells terrestrial and satellite communications hardware to be installed on remotely located machinery to enable such machinery to communicate with Provider's Software." [Dkt 12-3 at ¶ B].

[7]  The integration clause states:

F.3d 194 (noting that merger or integration clauses provide "conclusive evidence" of contracting parties' intent that aa subsequent agreement will supersede the first).  Defendant argues that the merger clause's provision which limits its scope to its "subject matter" means that the 2017 Contract is not fully integrated and, thus, does not supersede the 2013 Contract.  [Dkt. 90 at 11–14].  Defendant relies on *Pearson v. Valeant Pharmaceuticals International, Inc.* to argue that the Court must interpret this limiting clause "strictly" to find that the 2017 Contract does not supersede the 2013 Contract.  [Dkt. 90 at 13] (citing *Pearson*, 2017 WL 6508358).

Defendant's argument fails for two reasons.  First, as explained above, the 2017 and 2013 Contracts both contemplate intellectual property rights to Plaintiff's Field Units and therefore concern the same subject matter.  Second, Defendant's reliance on *Pearson* is misplaced.  The *Pearson* court analyzed two consecutive contracts, the first of which contained an arbitration clause, while the second did not contain arbitration clause or forum selection clause and was otherwise silent as to where the parties would resolve disputes.  *Id.* at *2.  However, the second contract included a merger clause which—like the 2017 Contract's merger clause—contained a provision limiting its scope to "the subject matter of this Agreement."[8]  The plaintiff sued

---

> **Complete Agreement**. This Agreement constitutes the entire agreement between the parties with respect to its subject matter, and supersedes any and all prior or contemporaneous understandings or agreements whether written or oral.  No amendment or modification of this Agreement will be binding unless reduced to a writing signed by duly authorized representatives of the parties and such writing makes specific reference to this Agreement and its intention as an amendment hereto.

[Dkt. 12-3 at ¶ 11.i] (boldface in original).

[8] In pertinent part, the merger clause stated, "[t]his Agreement sets forth the entire agreement between [plaintiff] and [defendant] concerning the termination of [plaintiff's] employment and his service as a consultant to [defendant], and supersedes any other written or oral promises **concerning the subject matter of this Agreement**." *Id.* at *2 (emphasis added).

alleging that defendant breached the second agreement, and the defendant moved to compel arbitration based on the earlier contract's arbitration clause.

The court held that the earlier contract's arbitration clause survived second contract's merger clause and granted the defendant's motion to compel arbitration. The court acknowledged that a "subsequent agreement contain[ing] an unambiguous complete integration or merger clause" generally supersedes a prior agreement. *Id.* at *5. However, the court found that "[t]he arbitration provision in the 2015 Employment Agreement clearly concerns a distinct subject matter from the Separation Agreement, which is silent as to dispute resolution." *Id.* at *6. The court also found that the parties "decided not to draft a complete merger clause" because "[t]he parties chose the limiting phrase 'concerning the subject matter of this Agreement,' and the court cannot and will not ignore it.'" *Id.* *7. Because the parties chose to limit the second agreement to its "subject matter," and because the second agreement did not explicitly include a dispute resolution forum among its "subject matter," the court concluded that the second agreement did not supersede the first agreement's arbitration clause. *Id.* at *9.

This case presents a different set of facts. In *Pearson* the "subject matter" at issue was the arbitration clause itself. The *Pearson* court found that the later contract did not supersede the earlier only because the parties limited the second contract's merger clause to its "subject matter," *and* because the second contract did not explicitly include a dispute resolution forum among its "subject matter." *Id.* at *9. Here, both contracts include dispute resolution fora among their subject matter: the 2017 Contract contains a forum selection clause, and the 2013 Contract contains an arbitration clause. [Dkt. 12-3 at ¶ 11.b]. *See Applied Energetics, Inc.*, 645 F.3d at 525 (reviewing analogous forum selection and arbitration clauses in consecutive contracts and holding that the second contract's forum selection clause "specifically precludes arbitration…

16

and, by operation of the merger clause, displaces the [first contract's] arbitration clause."). Both contracts also include protection for Plaintiff's intellectual property rights among their subject matter, as discussed above. Therefore, even if the 2017 Contract was not fully integrated as to all of the 2013 Contract's "subject matter," it was fully integrated as to the "subject matter" relevant here: dispute resolution and intellectual property rights to the Field Units. *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) ("[T]he court must determine on an issue-by-issue basis whether a party bears a duty to arbitrate.").

Defendant raises several other arguments, none of which are persuasive. Defendant argues that that Plaintiff provided "products and services to [Defendant] for *over a year* before the [2013 Contract's] execution" which included "research and development … as well as delivery of complete products." [Dkt. 90 at 12] (emphasis in original). As evidence, Defendant attaches purchase order forms predating the 2013 Contract, and claims that "[t]hese purchase orders incorporated [Defendant's] Standard Terms and Conditions, which included different terms from [the 2017 and 2013 Contracts]." [*Id.*]. It is unclear from Defendant's argument whether these pre-2013-Contract "products and services" included the Field Units that form the basis of this dispute. In any event, this evidence does not show that the parties did not intend to protect Plaintiff's rights with respect to the Field Units when the parties *did* enter the 2013 Contract.

Defendant also argues that, beyond the plain language of the 2017 and 2013 Contracts, "there is no parol evidence indicating that Ken Golla, Xylem's negotiator of the 2017 SSSA, intended the 2017 SSSA to supersede the 2013 NDA. Instead, Mr. Golla testified at his deposition that he was unfamiliar with the 2013 NDA and did not recall seeing it." [Dkt. 90 at 14]. While New Jersey law permits courts to broadly consider parol evidence when interpreting

17

contracts, *see Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 270, 901 A.2d 341, 347 (2006), this evidence does not alter the Court's view that the 2017 and 2013 contracts both included the Field Units among their subject matter.

Ultimately, the Court concludes that both the 2013 and 2017 Contracts count the Hardware Units among their "subject matter." The Court finds that the 2013 Contract's arbitration clause is inconsistent with and cannot stand alongside the 2017 Contract's forum selection clause. Because the two contracts share subject matter but conflict regarding the forum for resolving disputes, the 2017 Contract's forum selection clause superseded the 2013 Contract's arbitration clause. As a result, no contract exists that requires Plaintiff to arbitrate issues concerning Plaintiff's intellectual property rights to its Field Units. Because there is no contract requiring arbitration, the Court does not reach Plaintiff's alternative arguments against arbitration.

### b. Remedy

In general, "'[i]f a court determines that a valid arbitration agreement does not exist ... it is obliged to enjoin arbitration.'" *Gruntal & Co. v. Steinberg*, 837 F. Supp. 85, 91 (D.N.J. 1993) (quoting *PaineWebber, Inc. v. Hartmann*, 921 F.2d 507 (3d Cir. 1990) (overruled on other grounds)). Plaintiff urges the Court to issue a declaration stating that the parties' present dispute concerning the 2013 Contract is not subject to arbitration. [Dkt. 88]. Plaintiff has not offered any argument or explanation as to why such a declaration is necessary. Plaintiff has also failed to explain why an order enjoining the arbitration would be inappropriate or insufficient. Plaintiff's motion for a declaration of non-arbitrability is therefore denied, and the court will issue an order enjoining further arbitration proceedings.

### c. Stay of Litigation Pending Arbitration

Because there is no arbitrable issue as to Plaintiff's intellectual property rights to its Field Units under the 2013 Contract, the Court denies Defendant's motion to stay this litigation pending arbitration. Likewise, because the Court will order the AAA to be enjoined, Plaintiff's request to continue litigation concurrently with arbitration is denied as moot. *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of Virgin Islands*, 842 F.3d 201, 208, 65 V.I. 468, 477 (3d Cir. 2016) ("A case is moot when 'the issues presented are no longer live….'" (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L.Ed.2d 642 (1979))).

## III. Conclusion

For the reasons discussed above, Defendant's motion to stay this case pending arbitration is denied. Plaintiff's motion for a declaration of non-arbitrability is also denied. The Court will enter an order enjoining the AAA arbitration proceedings. Because the arbitration will be enjoined, Plaintiff's request to continue litigation concurrently with arbitration is denied as moot.


May 13, 2021                                             /s/ Joseph H. Rodriguez

                                                   Hon. Joseph H. Rodriguez, USDJ